Norman H. Miller, Jr., Petitioner *v.* Workmen's Compensation Appeal Board (CertainTeed Corporation), Respondents.

Submitted on briefs April 11, 1985, to Judges MacPhail and Barry, and Senior Judge Barbieri, sitting as a panel of three.

*Martin K. Brigham, Galfand, Berger, Senesky, Lurie & March,* for petitioner.

*David L. White,* for respondent, CertainTeed Corporation.

Opinion by Senior Judge Barbieri, August 21, 1985:

Norman H. Miller, Jr., Claimant, appeals here a decision of the Workmen's Compensation Appeal Board (Board) which affirmed a referee's decision disallowing compensation for the loss of use of Claimant's left eye under Section 306(c)(7) of The Pennsylvania Workmen's Compensation Act (Act).[1]

On June 13, 1980, Claimant suffered a compensable injury to his left eye for which compensation was paid during periods of disability. In this proceeding, by Modification Petition, he seeks compensation for loss of use of his left eye in that he has permanently lost the use of that eye for all practical intents and purposes. The injury was caused by a piece of metal

---

[1] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §513(7).

lodging in the left eye which required surgery and removal of the lens of the left eye. The referee made the following pertinent findings:

4. That the claimant presently makes use of an aphakic contact lens which effectively replaces the 'natural' lens of the left eye which was surgically removed as a result of such work-related injury.

5. That without the aphakic lens, the claimant has no central visual acuity but is able to perceive changes in light and maintains peripheral vision.

8. The claimant suffers a lack of depth perception and subjective complaints of distortion in central visual acuity when both the uninjured eye and corrected eye are used in conjunction with each other.

9. That Dr. Eskridge, upon whose testimony your Referee depends, feels that the advantage of gross peripheral vision in the claimant's left eye is significant and the limited usefulness of his left eye is preferable over the possibility of extraction and/or removal of the left eye.

10. That claimant's left eye then [sic] uncorrected when used in conjunction with the uninjured eye is useful and provides a significant contribution to claimant's total vision.

Claimant specifically questions the referee's 9th and 10th findings, calling to our attention our holding in *George v. Workmen's Compensation Appeal Board*, 63 Pa. Commonwealth Ct. 23, 437 A.2d 521 (1981) in which we affirmed that whether vision is lost for all practical intents and purposes is a mixed question of law and fact. Since we believe that the referee mis-

applied and misconstrued legal conclusions to be drawn from the testimony, we will reverse.

While the scope of our review is limited, it is our responsibility to determine whether constitutional rights have been violated, whether an error of law was committed, or there has been a capricious disregard of competent evidence. *Killian v. Workmen's Compensation Appeal Board,* 62 Pa. Commonwealth Ct. 29, 434 A.2d 906 (1981). In determining whether or not an award should be entered under Section 306(c)(7) of the Act for loss or loss of use of an eye, the standard where the eye has been injured but has not been totally destroyed or removed, is as follows:

> The ultimate test finally arrived at, after much travail, is that of whether the injured eye was lost *for all practical intents and purposes,* not whether claimant in fact has vision in the injured eye. In facilitation of the application of the ultimate test, a further standard has been adopted: Compensation may not be had if, using both eyes, the claimant can see better, in general, than by using the uninjured eye alone; . . . or, as otherwise stated, there may be compensation if the use of the injured eye does not *contribute materially* to the claimant's vision in conjunction with the use of the normal eye. . . .

*Hershey Estates v. Workmen's Compensation Appeal Board,* 9 Pa. Commonwealth Ct. 470, 473, 308 A.2d 637, 639 (1973) (emphasis added, citations omitted). See *also, Fidler v. Workmen's Compensation Appeal Board (United Cable Corp.),* 83 Pa. Commonwealth Ct. 155, 478 A.2d 907 (1984); *Armco Steel Corp. v. Workmen's Compensation Appeal Board (Magnone),* 68 Pa. Commonwealth Ct. 118, 448 A.2d 673 (1982); *Neshaminy Construction Co. v. Workmen's Compensation Appeal Board (Martin),* 43 Pa. Commonwealth Ct. 357, 402 A.2d 1111 (1979).

Furthermore, in order to determine loss of use of an injured member for all practical intents and purposes

... it is not necessary that the injured member of the Claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes.

*Neshaminy*, 43 Pa. Commonwealth Ct. at 358, 402 A.2d at 1111.

Turning now to the testimony, we note at the outset that Claimant, and his attending surgeon, Timothy Eskridge, M.D., were the sole witnesses in this case and that, therefore, this is not a case in which conflicts in testimony require a solution by a fact finder. *See George,* 63 Pa. Commonwealth Ct. at 29-30, 437 A.2d at 524.

Dr. Eskridge testified:

Q. When you asked Mr. Miller at that time to read the Snellen Chart, what did he describe it as?

A. Just a light at the end of the room, was all that was perceived.

Q. Now, what distance would have Mr. Miller count fingers?

A. Approximately three feet, 2 to 3 feet.

. . . .

Q. And without the aphakic correction?

A. He didn't have any central visual acuity to speak of at all.

. . . .

And uncorrected visual acuity in the left eye was hand motions.

Claimant has loss of all except some peripheral vision which has no visual significance but provides

some protective qualities as described by Dr. Eskridge as follows:

A.  You mean, how useful is that eye to him without correction?

Q.  Right.

A.  Well, he can see a bus coming; he could avoid being hit by a bus, or a train. He certainly couldn't be allowed to drive or work, or do anything like that.

Q.  Would he be functionally blind?

A.  He would be legally blind.

.  .  .  .

A.  Objects coming from the left can be perceived in his peripheral vision. While peripheral visual acuity is difficult to measure, he certainly should be able to avoid speeding cars, linebackers, and such from the left side. I am not trying to be funny. That is the limited usefulness and it is not insignificant.

Later in his testimony, Dr. Eskridge stated concerning Claimant's peripheral vision: "It does not contribute at all to his central acuity, without correction," and, under cross-examination, as to his statement that Claimant's peripheral vision was "not insignificant,"[2] Dr. Eskridge testified:

Q.  And you felt that was not insignificant?

A.  That's not insignificant.

Q.  Which means it's significant?

A.  Yes. *How significant is debatable.* (Emphasis added.)

---

[2] Dr. Eskridge's comments as to Claimant's peripheral vision must be viewed in the light of his admission that his peripheral vision study was incomplete. He stated: "I have not done a normal peripheral, visual field examination on him. I suppose somewhere along the line that should be done." Record, 88-A.

Furthermore, Claimant is admittedly disadvantaged rather than aided by the peripheral vision which causes distortion and blurring when used in conjunction with the uninjured eye, also rendering it more difficult to read than with the impaired eye closed.

As to the disadvantages suffered by Claimant in trying to make use of what slight vision remains in his injured eye, Dr. Eskridge testified:

Q. And the disadvantages that you've noted to Mr. Miller, as far as his total vision, when using his left eye, uncorrected, the disadvantages were the depth perception, distortion and the annoyance that he experiences.

A. Yes.

It is obvious to us upon careful review of the testimony of record that this Claimant has indeed lost the use of his left eye for all practical intents and purposes in light of the delineations which we have expressed in *Hershey, Neshaminy* and *Fidler*. *Neshaminy* and *Fidler* are almost indistinguishable and in both of these cases we ruled that loss of all but peripheral vision adequately established loss of use for all practical intents and purposes. In *Neshaminy,* as in the instant case, the medical witnesses testified that Claimant's peripheral vision blurred to some extent, providing him only with "getting ,around vision" in his left eye. In *Fidler,* the medical witness testified that the left eye, the injured one, contributed "slightly" to vision in the injured eye and we there held that contribution by the injured eye to the uninjured one was not to a material extent[3] and that, therefore, the referee's findings to the contrary must be disapproved. We so hold in this case, noting that the test

---

[3] In our view, the mere fact, as in *Neshaminy,* that the eye has protective value in that the Claimant is able to distinguish light and shadows, does not establish this as *a material contribution to the uninjured eye.*

is not as the referee appears to have concluded in his induced hearing loss and that his diagnosis of a fistula of his left eye is preferable over the possibility of extraction and/or removal of the left eye;" such a test is, of course, contrary to the law.

Accordingly, we will reverse the order of the Board.

ORDER

Now, August 21, 1985, the order of the Workmen's Compensation Appeal Board, at No. A-84473, is hereby reversed.

AMENDED ORDER

Now, October 16, 1985, it is ordered that our order, dated August 21, 1985 reversing the order of the Workmen's Compensation Appeal Board, at No. A-84473, shall be and is hereby amended and judgment is hereby entered in favor of Norman H. Miller, Jr., and against CertainTeed Corporation; and Certain-Teed Corporation is directed to pay to Norman H. Miller, Jr., compensation for loss of the eye for 275 weeks commencing November 10, 1980 at the weekly rate of $242.00, with interest at the rate of ten percent (10%) per annum on each installment from the respective due dates thereof, and such interest shall accrue and be paid on all installments which remain due and unpaid beginning as of January 22, 1981.